## Case No. 12,299.

### SANDERSON v. The COLUMBUS.

[3 Am. Law J. (N. S.) 268: 4 Pa. Law J. Rep. 493; 8 Leg. Int. 31.]

District Court, E. D. Pennsylvania. Nov., 1850.

COLLISION BETWEEN STEAMER AND SAIL — DUTY OF STEAMER TO CHANGE COURSE — INSUFFICIENT LOOKOUT.

[1. A steamer is always to be regarded as a vessel going free, and must, consequently, give way to a sailing vessel going closehauled; and this implies that a sailing vessel going closehauled shall not be at liberty to change her course when meeting a steamer.]

[2. Where a steamer going at nine knots. and meeting a sailing vessel going closehauled, merely reversed her propeller without changing her helm, and it was claimed in her defense that there was not sufficient time for her to change her course, held, that this defense was founded upon a mistaken theory; for it is manifest that a steamer going at that speed can more easily change her course than entirely arrest her progress.]

[3. Where a steamer meeting a schooner on a clear. starlit night failed to perceive her until within about 300 yards, although her sails presented a surface of 30 feet at right angles to the line of vision. held. that the steamer was in fault for not maintaining a vigilant lookout.]

In admiralty.

J. Muray Rush and H. J. Williams, for libellant.

Ed. Waln, for respondent.

Before KANE, District Judge. The leading facts upon which my decree in this case will rest are these: The steam propeller Columbus left Philadelphia on the 30th of November, 1848, for Charleston, S. C., and at half past two o'clock in the morning of the 3d December, (civil time,) she was in the neighborhood of Cape Lookout Shoals, heading south-west, on her starboard tack, going about nine knots an hour. The schooner Mission, a new vessel of 112 tons, was returning to Edenton, N. C., with a cargo of salt from Rum Key. She was on her larboard tack, steering north-east, going at the rate of five knots, or something less. The wind was fresh from the north-west; the sea was rough from the action of the south-east wind that had prevailed for some days before; it was a starlight night. It is said that the two vessels were about three hundred yards from each other, perhaps less, perhaps a little more, when the look out man of the steamer saw the schooner approaching bearing about a point, or a point and a half, on the steamer's larboard bow. The engine was stopped at once and reversed; but there was no hail on either side, and neither vessel varied her course. The consequence was a collision of the steamer's bow and the starboard quarter of the schooner, and the schooner sank immediately.

Whatever of controversy there may be as to other supposed or asserted facts, I believe that there is nothing in this succinct recital I have made which does not consist with the proofs exhibited in the case, and relied on by the respondents; and, if my views are just, it is not necessary to go beyond it. The question, whether the captain of the schooner was or was not improperly below at the time of collision, or whether the lookout man of the schooner was asleep, it might, perhaps, be difficult to decide; since the two persons whose evidence upon it would be of most interest were lost with the vessel. But the present issue connects itself no further with the conduct of the parties than as that conduct may have contributed to bring about the collision.

I am to decide the simple question: Was the collision occasioned by the fault of one, or of the other vessel. or was it unavoidable? And this question, though perhaps at first glance an embarrassing one to a person unfamiliar with those usages of navigation that form part of the law of the sea, admits of an easy solution with reference to them. 1 have been a little surprised to learn from some of the skillful seamen who have been examined in this case how little is known of those usages on shipboard. It is a rule. founded altogether in reason, and long and thoroughly recognized in the admiralty, that. on the open seas, vessels going free shall

give way to those that are going closehauled; and the correlative is equally well established, that a vessel going closehauled, when meeting a vessel going free, shall hold her course. These are absolute rules; and the vessel that violates either of them becomes answerable for any collision which may be the consequence. The reason of them is plain. The vessel going free has the command of her movements much more fully than the one that is closehauled. She can pass in either direction by a simple inclination of her helm, and without considerable loss of way; while the closehauled vessel can turn only in one direction, unless she goes into stays, and loses her course by the manœuvre,—hence the duty of the vessel going free. And as the vessel going closehauled might, by changing her course, place herself in the way of the other vessel, while that was conforming to the rule for the purpose of avoiding her, the duty enjoined on the closehauled vessel is equally reasonable. The same considerations which at first suggested these rules for sailing vessels, have, since steam has begun to be extensively applied as a motive power in navigation, grafted on them a rule applicable to steamers; viz. that a steamer shall be regarded always as a vessel going free, and must give way in consequence to a sailing vessel going closehauled. And this extension of the first rule implies a similar extension of the second; viz. that a vessel going closehauled, and meeting a steamer, shall not be at liberty to change her course. I have not indeed met a reported case which called for the enunciation of the rule thus modified; but I cannot doubt that as the argument which led to the original rule would apply with equal force to its modification also, the courts of admiralty would enforce both alike.

The application of these rules to the few facts I have recited may decide the present case. It was the duty of the Mission to hold her course; and it is conceded that she did so. The steamer, on the other hand, was bound to give way,—not merely to check her progress, but to change her course; in a word, to prevent the collision. It is conceded that she did not do so.

To relieve herself from the liability which should follow from this state of facts, two excuses are offered on behalf of the steamer: (1) That when the schooner was first descried, the distance between the two vessels was not sufficient to permit the steamer to give way in time; (2) that from the courses the two vessels were steering, heading nearly towards each other, with but three points of the compass or about thirty-four degrees of divergence between them, the steamer could not know in time which way the schooner was steering, and could not decide therefore in which direction she, the steamer, ought to pass in order to avoid her. The first of these excuses is clearly a mistake, if the evidence is correct that the steamer had overcome or

nearly overcome her momentum before the collision. For it requires no argument to show that a steamer going nine knots an hour can change her direction by shifting her helm much more promptly than she can bring herself to a state of rest in the water; and this remark is especially true of propellers generally, which answer their helm more readily than other vessels, and is sworn to be true in reference to the Columbus. Besides, it is demonstrable from the allegations of the witnesses themselves, which are in proof, that the accident could not have taken place had the steamer changed her helm in either direction, or had she even kept on her way. The medium rate of the steamer's motion from the moment of seeing the schooner to the moment of the encounter was about 4½ knots, or a little more. I say a little more, because the steamer was going at the rate of nine knots an hour at first, and because I think the manner in which the two vessels struck, and the character of the injury sustained by the schooner, as well as the fact that one of the drowning seamen from the wreck drifted past the steamer, go to show that the steamer's motion had not been entirely arrested when they came together. The schooner's rate of motion being something less than five knots or about the same as the medium rate of the steamer, the two vessels passed over very nearly equal spaces in the same time, and a simple trigonometrical computation from the elements given in the evidence (viz. their distance, 300 yards, and their bearing, 1½ points) determines for us that each passed over 157 yards before they met. Had the steamer kept up her speed of 9 knots, she would have passed over more than 300 yards instead of 157, and as her length is only 165 feet, and the schooner's only 76, it is clear they would have passed each other in safety. Another result from the same computation is that the vessels were approaching each other for about a minute and an eighth after the schooner was descried, a space of time abundantly sufficient to have allowed the steamer to give way by changing her helm.

The second excuse offered involves two questions: (1) Was there time enough, after the schooner was seen, to determine the direction of her course from on board the steamer? (2) If there was not, was it the fault of the steamer that the schooner was not seen sooner?

1. The broad side of the schooner, with her sail, was in fact more than 90 feet long; and, seen obliquely from the steamer's bow in the direction indicated by the evidence, she presented a surface of 30 feet at right angles to the line of view. She was heading northward, across the bow of the steamer, closehauled; and her apparent rate of motion, as seen by the lookout, before the steamer slacked her speed, was less than that of the steamer about 2⅛ feet per second. Had she been heading eastward of the steamer's bow,

she would have been going free, with the wind abeam; and the apparent difference between the rates of motion of the two vessels, as seen by the lookout, would then have been 6⅜ feet a second. Or, in other words, the vessels would in one case have appeared to be nearing each other at the rate of 1½, and in the other of 4½ knots. Now, I am not enough of a seaman to decide whether the practiced eye of a good lookout man would, or would not, have been able so to mark the difference in appearance and rate of motion in the two cases, as to determine at once in which direction the sail he saw was heading.

2. But on the other point I have no difficulty. The evidence is that the night was clear; and it is the opinion of the·skilful shipmasters who heard the case with me as assessors, that in such a night a vessel keeping a proper lookout should have seen another approaching her, 1½ points off her bow, at a much more considerable distance. I have myself made the trial; and though not by any means a person of more acute vision than landmen generally, I have no difficulty in discerning objects against the horizon, not larger than the Mission appeared; seen obliquely, at a distance nearly the double of 300 yards. And I agree, therefore, with them in thinking that the fault in which this collision had its origin is imputed to the want of proper lookout on the part of the steamer.

I have thus far discussed the case upon the premises put forward by the respondents. All the evidence indeed, except that of the schooner's helmsman,—the only survivor of her crew,—who saw nothing, and from his position could see nothing, till the steamer was cutting through his deck, all the rest of the evidence is from persons on board the steamer, and of these only the lookout man and the mate saw the schooner before the two vessels were in contact. It could scarcely be expected that the lookout man should attest his own want of vigilance; and it is not to make a serious imputation against him, to admit that he cannot now recall with unbiased accuracy the collateral incidents of a catastrophe, to which he was at least a painfully interested witness, if not a responsible party.

I confess, that after looking carefully through all the testimony, I am not without my doubts whether the schooner was seen at all until she approached nearer than the witnesses represent. There is nothing about which honest men swear so vaguely and contradictorily as the times which mark the progress of an exciting incident; and the distances, at the particular moments of such an incident, between objects that are both of them in motion; especially on the open sea, where there are no fixed objects intervening, and at night, when even the waves cannot be seen. It is often safer, in such a case, to refer back to the action which the circumstan-

ces of the moment suggested, in order to determine their character and force, than to seek to recall by a direct exercise of memory the precise circumstances themselves. Our best reasonings will be apt to mislead us, if we undertake to criticise the policy of our past actions, when time has begun to obscure the motives that led to them. On the other hand, what we call impulse is frequently nothing else than rapid deductions from observed facts. Now, the mate of the Columbus is represented, and I have no doubt truly, as an excellent seaman. From the moment the collision took place, nothing could be better than his management of the steamer, and the efforts he made to save the crew of the sinking vessel. How such a seaman, in command for the time of the steamer's deck, should have contented himself with stopping and reversing the engine, without shifting his helm, if there was time to do so, I am altogether unable to understand. If he was nearing the schooner for more than a minute after his attention was called to her, it is incredible to me that he could have omitted to put his wheel to port or to starboard. To have done so would have diminished the force of the collision, if a collision was unavoidable. I can hardly be mistaken in saying that it might have been prevented; it could under no aspect have done harm, and it was the manœuvre enjoined by the rules of navigation. There are other considerations which have the same tendency. I have already adverted to the fact that the steamer had not overcome her headway when the encounter took place. Yet, she had reversed her engine at the moment of the alarm. Can it be that a steamer, whose machinery is capable of impelling her 9 miles an hour with the wind abeam, is unable, by reversing its action, to arrest her course in less time than a minute and an eighth? It has been said, arbitrarily perhaps, that a steamer can bring herself up in her own length. We must assume that the Columbus cannot do so in less than three times that space, or else we must admit that the witnesses have overestimated her distance from the schooner when the schooner was seen first.

Another circumstance still appears to me scarcely reconcilable with the idea of the schooner's having been seen approaching so long; it is that she was not hailed by any one on board the steamer. It is said that the weather was too rough to allow a hail to be heard; and it may be that such was the fact. But it seems strange to me that the trial at least was not made. I can scarcely realize that right-hearted men could be schooled into such confident certainty of the fruitlessness of an effort. and could have their instincts of manly sympathy so well under control, as not to call out when they saw for more than a minute a vessel with her crew moving onward steadily, and with seeming unconsciousness, to inevitable destruction.

The gentlemen who assisted me at the hearing have presented the nautical views of the question so well in the report with which they have favored me while this opinion has been preparing that I do not think it worth while to pursue the subject farther. The report is in these words: "Sanderson v. Steamer Columbus. The undersigned, assessors in the above case, have duly and carefully considered all the facts in evidence before the court of admiralty, relative to the collision of steamship Columbus, of Philadelphia, and schooner Mission, of Edenton, N. C., which occurred December 3d, 1848, near Cape Lookout Shoals, on the coast of North Carolina, and are of opinion that the means of avoiding said collision was possessed exclusively by the Columbus. That the Mission was pursuing her proper course, by the wind, on the larboard tack, heading to the northward, and that any change in her course, for the purpose of giving way to the Columbus, was uncalled for, and ought not to have been expected. That it was a clear starlight morning, and the wind moderate. That a vessel of the size of the Mission could have been seen at the time a sufficient distance to have been safely passed on either side, had a proper lookout been kept on board the Columbus. And that the neglect to do so was, in our judgments, the cause of this most disastrous collision, and to which it is to be entirely attributed. Respectfully submitted, Christian Gulagee. Silas Pedrick. Philadelphia, Nov. 22, 1850."

I decree for the libellant; and refer it to Mr. Commissioner Heazlitt, to ascertain the amount of damages. Costs to follow the decree.

PER CURIAM. Decree and order accordingly.